**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**WILLIAM ELLISON,**

**ABDUL GHAFOORY,**

**SHABANA GHAFOORY,**

**O.G., a minor, by and through their parent**
**and legal guardian, ABDUL GHAFOORY,**

**S.G., a minor, by and through their parent**
**and legal guardian, ABDUL GHAFOORY,**

**R.G., a minor, by and through their parent**
**and legal guardian, ABDUL GHAFOORY,**

**BASHAR MAL GHAFOORI,**

**SHAMSULHAQ GHAFOORI,**

**AHMAD SHIRZAD,**

**BAS BIBI SHIR ZAD,**

**FARDIN SHIR ZAD,**

**K.S., a minor, by and through their parent**
**and legal guardian, AHMAD SHIRZAD,**

**Su.S., a minor, by and through their parent**
**and legal guardian, AHMAD SHIRZAD,**

**Z.S., a minor, by and through their parent**
**and legal guardian, AHMAD SHIRZAD,**

**KHAIRALLAH SHIRZAD,**

**AHMAD RAHIMI,**

**KARISHMA RAHIMI,**

**FAZAL RAHIMI,**

**LAILUMA RAHIMI,**

**BASHIR BIGZAD,**

**FROZAN BIGZAD,**

**FORUGH BIGZAD,**

**FARUKH BIGZAD,**

**BIBI BIGZAD,**

**Sa.B., a minor, by and through their parent
and legal guardian, BASHIR BIGZAD,**

**So.B., a minor, by and through their parent
and legal guardian, BASHIR BIGZAD,**

**MIRWAIS SAFI,**

**SHOGOFA SAFI,**

**M.S., a minor, by and through their parent
and legal guardian, MIRWAIS SAFI,**

**Ar.S., a minor, by and through their parent
and legal guardian, MIRWAIS SAFI,**

**Sh.S., a minor, by and through their parent
and legal guardian, MIRWAIS SAFI,**

**MOHAMMAD PARDIS,**

**EQLIMA PARDIS,**

**HASIBULLAH PARDIS,**

**ROHULLAH PARDIS,**

**LOTFULLAH PARDIS,**

**B.P., a minor, by and through their parent
and legal guardian, MOHAMMAD PARDIS,**

**M.P., a minor, by and through their parent
and legal guardian, MOHAMMAD PARDIS,**

**MOHAMMAD GHEYASI,**

**FAZILA GHEYASI,**

**MOHAMMAD GHYASI,**

**BIBI GHEYASI,**

**JOHN DOE 1,**

**JOHN DOE 2,**

**JOHN DOE 3,**

**JOHN DOE 4,**

**Z.M.,**

**A.M., a minor, by and through their parent
and legal guardian, JOHN DOE 1,**

**Y.M., a minor, by and through their parent
and legal guardian, JOHN DOE 1,**

**Sh.O.,**

**Sad.O.,**

**M.A.O., a minor, by and through their parent
and legal guardian, JOHN DOE 2,**

**M.Z.O., a minor, by and through their parent
and legal guardian, JOHN DOE 2,**

**Mu.O.,**

**Sa.O., a minor, by and through their parent
and legal guardian, JOHN DOE 3,**

**So.O., a minor, by and through their parent
and legal guardian, JOHN DOE 3,**

**Sos.O.,**

**Mo.A.O.,**

**Ma.S.,**

**F.O.,**

**M.O.,**

**M.Q.O.,**

**M.W.O.,**

**M.M.O.,**

**Mas.S.,**

**Mo.S.,**

**S.S.,**

**Ab.S., a minor, by and through their parent
and legal guardian, Mas.S.,**

**and**

**H.S., a minor, by and through their parent
and legal guardian, Mas.S.,**

**Plaintiffs,**

**v.**                                          **Case No. 1:25cv2250**

**ISLAMIC REPUBLIC OF IRAN**
**Serve:**      **Foreign Minister Seyyed Abbas Araghchi**
              **Ministry of Foreign Affairs**
              **Khomeini Avenue**
              **United Nations Street**
              **Tehran, Iran**

**Defendant.**

## **COMPLAINT**

NOW COME the Plaintiffs, WILLIAM ELLISON, ABDUL GHAFOORY, individually

and as the legal guardian for O.G., S.G., and R.G., SHABANA GHAFOORY, BASHAR MAL

GHAFOORI, SHAMSULHAQ GHAFOORI, AHMAD SHIRZAD, individually and as the legal

4

guardian for K.S., Su.S., and Z.S., BAS BIBI SHIR ZAD, FARDIN SHIR ZAD,

KHAIRALLAH SHIRZAD, AHMAD RAHIMI, KARISHMA RAHIMI, FAZAL RAHIMI,

LAILUMA RAHIMI, BASHIR BIGZAD, individually and as the legal guardian for Sa.B and

So.B, FROZAN BIGZAD, FORUGH BIGZAD, FARUKH BIGZAD, BIBI BIGZAD,

MIRWAIS SAFI, individually and as the legal guardian for M.S., Ar.S., and Sh.S., SHOGOFA

SAFI, MOHAMMAD PARDIS, individually and as the legal guardian for B.P. and M.P.,

EQLIMA PARDIS, HASIBULLAH PARDIS, ROHULLAH PARDIS, LOTFULLAH PARDIS,

MOHAMMAD GHEYASI, FAZILA GHEYASI, MOHAMMAD GHYASI, BIBI GHEYASI,

JOHN DOE 1, individually and as the legal guardian for A.M. and Y.M., JOHN DOE 2,

individually and as the legal guardian for M.A.O. and M.Z.O., JOHN DOE 3, individually and as

the legal guardian for Sa.O. and So.O., JOHN DOE 4, Z.M., Sh.O., Sad.O., Mu.O., Sos.O.,

Mo.A.O., Ma.S., F.O., M.O., M.Q.O., M.W.O., M.M.O., Mas.S., individually and as the legal

guardian for Ab.S. and H.S., Mo.S., and S.S. (collectively referred to herein as "Plaintiffs"), by

counsel, and for their Complaint against Defendant, the ISLAMIC REPUBLIC OF IRAN

("Iran"), arising out of two terrorist attacks in Afghanistan on January 4, 2016 and May 31, 2017,

state as follows:

## I.    THE PARTIES

1.    William Ellison ("Ellison") is a victim of the January 4, 2016 bombing. He was a

citizen of the United States at all times relevant to this Complaint.

2.    Abdul Ghafoory ("Ghafoory") is a victim of the January 4, 2016 bombing. He

was on duty and working within the scope of his employment on a contract with the United

States at the time of the attack.

3.    Shabana Ghafoory is the wife of Ghafoory.

4.      O.G. is the minor child of Ghafoory.

5.      S.G. is the minor child of Ghafoory.

6.      R.G. is the minor child of Ghafoory.

7.      Bashar Mal Ghafoori is the brother of Ghafoory.

8.      Shamsulhaq Ghafoori is the brother of Ghafoory.

9.      Ahmad Shirzad ("Shirzad") is a victim of the January 4, 2016 bombing. He was on duty and working within the scope of his employment on a contract with the United States at the time of the attack.

10.     Bas Bibi Shir Zad is the wife of Shirzad.

11.     Fardin Shir Zad is the son of Shirzad.

12.     K.S. is the minor child of Shirzad.

13.     Su.S. is the minor child of Shirzad.

14.     Z.S. is the minor child of Shirzad.

15.     Khairallah Shirzad is the father of Shirzad.

16.     Ahmad Rahimi ("Rahimi") is a victim of the January 4, 2016 bombing. He was on duty and working within the scope of his employment on a contract with the United States at the time of the attack.

17.     Karishma Rahimi is the wife of Rahimi.

18.     Fazal Rahimi is the father of Rahimi.

19.     Lailuma Rahimi is the mother of Rahimi.

20.     Bashir Bigzad ("Bigzad") is a victim of the January 4, 2016 bombing. He was on duty and working within the scope of his employment on a contract with the United States at the time of the attack.

21.     Frozan Bigzad is the wife of Bigzad.

22.     Forugh Bigzad is the daughter of Bigzad.

23.     Farukh Bigzad is the son of Bigzad.

24.     Bibi Bigzad is the daughter of Bigzad.

25.     Sa.B. is the minor child of Bigzad.

26.     So.B. is the minor child of Bigzad.

27.     Mirwais Safi ("Safi") is a victim of the January 4, 2016 bombing. He was on duty and working within the scope of his employment on a contract with the United States at the time of the attack.

28.     Shogofa Safi is the wife of Safi.

29.     M.S. is the minor child of Safi.

30.     Ar.S. is the minor child of Safi.

31.     Sh.S. is the minor child of Safi.

32.     Mohammad Pardis ("Pardis") is a victim of the January 4, 2016 bombing. He was on duty and working within the scope of his employment on a contract with the United States at the time of the attack.

33.     Eqlima Pardis is the wife of Pardis.

34.     Hasibullah Pardis is the son of Pardis.

35.     Rohullah Pardis is the son of Pardis.

36.     Lotfullah Pardis is the son of Pardis.

37.     B.P. is the minor child of Pardis.

38.     M.P. is the minor child of Pardis.

39.     Mohammad Gheyasi ("Gheyasi") is a victim of the January 4, 2016 bombing. He was on duty and working within the scope of his employment on a contract with the United States at the time of the attack.

40.     Fazila Gheyasi is the wife of Gheyasi.

41.     Mohammad Ghyasi is the father of Gheyasi.

42.     Bibi Gheyasi is the mother of Gheyasi.

43.     John Doe 1 is a victim of the January 4, 2016 bombing. He was on duty and working within the scope of his employment on a contract with the United States at the time of the attack.

44.     John Doe 2 is a victim of the January 4, 2016 bombing. He was on duty and working within the scope of his employment on a contract with the United States at the time of the attack.

45.     John Doe 3 is a victim of the January 4, 2016 bombing. He was on duty and working within the scope of his employment on a contract with the United States at the time of the attack.

46.     John Doe 4 is a victim of the January 4, 2016 bombing. He was on duty and working within the scope of his employment on a contract with the United States at the time of the attack.

47.     John Doe 1, John Doe 2, John Doe 3, and John Doe 4 are brothers.

48.     Z.M. is the wife of John Doe 1.

49.     A.M. is the minor child of John Doe 1.

50.     Y.M. is the minor child of John Doe 1.

51.     Sh.O. is the wife of John Doe 2.

52.    Sad.O. is the daughter of John Doe 2.

53.    M.A.O. is the minor child of John Doe 2.

54.    M.Z.O. is the minor child of John Doe 2.

55.    Mu.O. is the wife of John Doe 3.

56.    Sa.O. is the minor child of John Doe 3.

57.    So.O. is the minor child of John Doe 3.

58.    Sos.O. is the wife of John Doe 4.

59.    Mo.A.O. is the father of John Does 1–4.

60.    Ma.S. is the mother of John Does 1–4.

61.    F.O. is the sister of John Does 1–4.

62.    M.O. is the sister of John Does 1–4.

63.    M.Q.O. is the brother of John Does 1–4.

64.    M.W.O. is the brother of John Does 1–4.

65.    M.M.O. is the brother of John Does 1–4.

66.    Mas.S. is the widow of John Doe 5, a victim of the May 31, 2017 bombing. John Doe 5 was working within the scope of his employment on a contract with the United States at the time of the attack.

67.    Mo.S. is the son of John Doe 5.

68.    S.S. is the daughter of John Doe 5.

69.    Ab.S. is the minor child of John Doe 5.

70.    H.S. is the minor child of John Doe 5.

71.    Defendant, Iran, is a foreign state. Since January 19, 1984, Iran has been designated as a state sponsor of international terrorism pursuant to Section 6(j) of the Export

Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

## II.     JURISDICTION AND VENUE

72.     Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), 1367, and 1605A.

73.     Despite its status as a foreign state, Iran is subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, as amended, specifically 28 U.S.C. § 1605A, due to Iran's longstanding designation as a "State Sponsor of Terrorism."

74.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(f)(4).

75.     At the time of the attacks, Ellison, Ghafoory, Shirzad, Rahimi, Bigzad, Safi, Pardis, Gheyasi, John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 (collectively, "the Attack Victims") were on duty working within the scope of their employment on a contract with the United States. Each of the Attack Victims suffered physical injuries. At least one individual, including John Doe 5, died in each of the attacks.

## III.     NATURE OF THE ACTION

76.     On January 4, 2016, at 6:34pm local time, a truck containing over three thousand pounds of explosives was detonated outside of Camp Sullivan, a property located near the Kabul International Airport and used to house United States embassy personnel (the "Camp Sullivan Attack"). The explosion killed two bystanders and wounded more than thirty people, including each of the Attack Victims. The Taliban publicly claimed responsibility.

77.     On May 31, 2017, at 8:25am local time, a truck containing over three thousand pounds of explosives was detonated near a busy intersection, known as Zanbaq Square, in the diplomatic quarter of Kabul, Afghanistan. Nearby buildings included the German, French,

Turkish, and British embassies, as well as buildings used as offices for American personnel and contractors. The explosion killed at least 150 people and injured over 400. John Doe 5 was among those killed.

78.    These two attacks were the product of a broader conspiracy between the Taliban and Iran to attack American interests in Afghanistan with violent acts of terrorism.

79.    Iran long served as a co-conspirator with the Taliban. The Iranian regime leveraged that relationship to advance its goal of expanding its religious, political, and cultural influence in Afghanistan by fostering political instability and pressuring American leaders to withdraw military forces.

80.    To carry out these attacks, Taliban operatives needed financial support, training in the use of explosives and tactics, freedom to travel across the border with Iran, and access to explosive materials. Iran has consistently provided the Taliban with each of these types of support since at least 2007.

81.    By knowingly and intentionally providing material support and resources to enable and assist the Taliban in carrying out acts of terrorism, Iran is liable for the damages suffered by Plaintiffs as a direct and proximate result of the attacks.

## IV.    FACTUAL ALLEGATIONS

### A.    <u>Iran's Substantial and Pervasive Support for International Terrorism</u>

82.    Since the Iranian revolution in 1979, Iran has engaged in and supported terrorist organizations and acts of terrorism as an instrument of its foreign policy.

83.    Iran's widespread support for terrorist groups, such as Hezbollah, Hamas, and the Taliban, is well-documented. As a result, the State Department has designated Iran as a state sponsor of terrorism since 1984.

84.    Iran carries out its support of terrorism, in large part, through the Islamic Revolutionary Guard Corps ("IRGC"), which is a military force parallel to the regular Iranian military. The IRGC is supervised by the Iranian Parliament but operates as an agent and instrumentality of the Supreme Leader of Iran, Ayatollah Ali Hoseini Khamenei. The Supreme Leader serves as commander and chief of the armed forces, appoints the head of each military service, declares war and peace, appoints the head of the judiciary, and may dismiss the elected president of Iran at any time.

85.    The IRGC also has a constitutional role as the defender of the Islamic Revolution and owns or controls hundreds of companies, particularly those in the oil and gas, engineering, telecommunications, and infrastructure sectors, and holds billions of dollars in military business and other government contracts.

86.    On April 15, 2019, the IRGC was formally designated by the State Department as a Foreign Terrorist Organization.

87.    The IRGC has a special foreign division, known as the Quds Force ("IRGC-QF"), which is the branch of the IRGC primarily used to promote and support terrorism abroad. The IRGC-QF has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing, and is one of the most organized, disciplined, and deadly organizations in the world.

88.    The IRGC-QF provides funding and training for terrorism operations targeting American interests, including support for terrorist organizations like Hezbollah, al Qaeda, and the Taliban. These activities are known and sanctioned by Iran's Supreme Leader and are an official platform of Iran's foreign policy.

89.     Accordingly, pursuant to Executive Order 13224, the Treasury Department has designated the IRGC-QF as a "terrorist organization" and the State Department has designated the IRGC-QF as a "foreign terrorist organization."

90.     Iran also supports terrorism through its Ministry of Information and Security ("MOIS"), which is an intelligence agency. Like the IRGC-QF, MOIS has been involved in kidnappings, assassinations, and other acts of terrorism since its inception.

**B.     The Taliban**

91.     The Taliban is a Sunni Islamic organization that was founded in 1994 by a man known as Mullah Mohammed Omar for the purpose of imposing Sharia law throughout Afghanistan. The Taliban was largely successful in this effort, effectively ruling Afghanistan from 1996 until 2001.

92.      Following the September 11, 2001 terrorist attacks, the United States demanded that the Taliban surrender Osama bin Laden. The Taliban refused, leading to an American-led invasion of Afghanistan with the purpose of toppling the Taliban regime.

93.     The invasion was initially successful at expelling the Taliban from political control over Afghanistan. A transitional government ratified a Constitution in December 2003 without assistance or participation from the Taliban.

94.     The Taliban responded by setting up what became known as "shadow" governments in various local and regional areas throughout Afghanistan, allowing it to maintain a substantial level of influence and control.

95.     Since the 2001 invasion, the Taliban's singular focus has been to expel foreign forces from Afghanistan and to regain its authority over the country. The primary means of

achieving that goal has been the planning, support, and execution of terrorist attacks against American personnel and interests.

96.     The Taliban was formally named a Specially Designated Global Terrorist ("SDGT") on July 2, 2002.

97.     Despite ongoing counter-insurgency efforts, the Taliban's violent attacks and shadow political efforts have been quite effective, allowing them to regain and maintain some semblance of control and authority within substantial portions of Afghanistan.

**C.     The Haqqani Network**

98.     The Haqqani Network is a Sunni Islamic terrorist organization that was founded in Afghanistan in the 1970s.

99.     At all times relevant to this case, the Haqqani Network has effectively operated as an extension and alter-ego of the Taliban.

100.     Between 2008 and 2011, the United States Department of State designated four members of the Haqqani family as SDGTs.

101.     On September 19, 2012, the State Department designated the Haqqani Network as a Foreign Terrorist Organization pursuant to section 219 of the Immigration and Nationality Act.

102.     Then, in February 2014, the State Department designated an additional fourteen Haqqani Network leaders as SDGTs.

103.     The relationship between the Haqqani Network and the Taliban began as a mutually beneficial partnership shortly after the Taliban was formed, with the Haqqani Network supplying weapons for Taliban fighters.

104.     When the Taliban succeeded in seizing control over Afghanistan, the Haqqani Network and its leaders swore allegiance to the Taliban. In exchange, the Taliban appointed

Jalaluddin Haqqani, the group's founder, as the Minister of Tribal and Border Affairs for the new government. Jalaluddin Haqqani served in this role until the fall of the Taliban regime in 2001.

105.    With the success of the American-led invasion of Afghanistan, the Taliban and the Haqqani Network were permanently united in their objectives to repel the foreign forces and regain their territory and authority.

106.    Shortly after the invasion, a Jihadist internet publication described Jalaluddin Haqqani as the "chief of the Taliban army."

107.    Jalaluddin's son, Sirajuddin Haqqani, inherited his father's leadership of the Haqqani Network and his prominent role within the Taliban. The chief spokesman for the United States and NATO forces in Afghanistan stated that, as of 2016, Sirajuddin Haqqani "increasingly runs the day-to-day military operations for the Taliban and, we believe, is likely involved in appointing shadow governors."

108.    In 2016, a senior Taliban commander was quoted as saying that Sirajuddin Haqqani was in "constant contact" with Taliban military commanders throughout Afghanistan and that all field commanders were required to confirm their fighting plans with him.

109.    Taliban spokesmen and key Haqqani Network leaders have both confirmed that the Haqqani Network operates in concert with the Taliban.

**D.    The Development of the Iran-Taliban-Haqqani Network Relationship**

110.    Although the Iranian regime is Shia and the Taliban/Haqqani Network are Sunni organizations, those religious differences did not keep them from conspiring together in terrorist activities.

111.    Iran first provided limited support to Sunni Afghan groups during the Soviet-Afghan War, where its primary goal was to resist the expansion of both communist and Western

influence in the region. Iranian support to these groups in the fight against Russian forces was often conditioned on the adoption of anti-American positions and Iran condemned any reliance on Western-supplied weapons during the conflict.

112.    During this time, Ayatollah Khomeini, Iran's Supreme Leader until his death in 1989, publicly stated that Iran should welcome all Afghans, including Sunnis, particularly because of their common enemies.

113.    The relationship between Iran and the Taliban was still a contentious and violent one. Following the withdrawal of Soviet troops in 1989, Afghanistan was engulfed in civil war for much of the 1990s. On one side of that conflict were Shia militias, whom Iran actively supported with the hope of establishing a friendly Shia government on its eastern border. This effort was ultimately unsuccessful, however, as by 1996 the Taliban, with the assistance of the Haqqani Network, had secured control over most of Afghanistan and largely eradicated the Shia forces.

114.    Tensions between Iran and the Taliban peaked in August 1998 when Taliban forces captured the city of Mazar-I Sharif in northwestern Afghanistan. After capturing the city, the Taliban targeted ethnic Shia individuals for execution. Among those killed were eight Iranian consulate officials and an Iranian journalist, whom the Taliban later claimed had been operating as intelligence officers.

115.    This tense dynamic between Iran and the Taliban dramatically shifted after September 11, 2001 and the subsequent American-led invasion of Afghanistan. For the first time since the Soviet-Afghan War, the sides had common ground in opposing the rapid growth of foreign influence in the region.

116.    In fact, groundwork for this shift had begun forming prior to the 9/11 attacks. In January 2001, a Taliban delegation met with senior Iranian officials to discuss various military and political matters. One such topic was "Iran's purported desire to see the Taliban join the Northern Alliance in order to defend Afghanistan" in the event of an American invasion. *See Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 36 (D.D.C. 2011).

117.    As soon as October 2001, members of the IRGC were already meeting with Sunni Afghan militants, including both Taliban and Haqqani Network fighters, to offer them military support and resources. Iran instigated this meeting and it was held on the Iranian side of the Afghan border. *Id.* at 37. This gathering officially ushered in a new era of cooperation between Iran and the Taliban.

118.    As part of this initial offer of support, Iran pledged to sell advanced military equipment to the Taliban for use against Americans, bragged of their ability to track US military forces, and promised "to open their border to Arabs entering Afghanistan." Iran also "offered to broker a peace between the Taliban and the Northern Alliance so Muslims could unite against the United States." *Id.* at 38.

119.    Shortly before Coalition air strikes began in 2001, Iran sent a high-ranking official to offer sanctuary to Taliban leaders. Those who travelled to Iran were allowed to move freely across the Iran-Afghanistan border to recruit fighters and inflict damage on Afghan and Coalition interests. The IRGC offered these same Taliban forces cash rewards for the killing of Afghan officials or American soldiers.

120.    In February 2002, then Director of Central Intelligence, George J. Tenet, testified before Congress that "initial signs of Tehran's cooperation and common cause with us in Afghanistan are being eclipsed by Iranian efforts to undermine US influence there. While Iran's

officials express a shared interest in a stable government in Afghanistan, its security forces appear bent on countering the US presence."

121.    In March 2007, a shipment of Iranian-made weapons bound for the Taliban was captured by American forces inside Afghanistan. This shipment included mortars and plastic explosives bearing markings indicating that they were manufactured in Iran.

122.    In January 2009, the official spokesman for the Pentagon stated that the United States had observed Iranian support in Afghanistan.

123.    On August 30, 2009, U.S. Army General Stanley McChrystal, the commander of American forces in Afghanistan, referred to Iran's role in Afghanistan at that time as "ambiguous." While Iran appeared to support the development of the new government in Kabul, the IRGC-QF was training Taliban and Haqqani Network fighters "and providing other forms of military assistance to insurgents." He noted that "Iran has the capability to threaten the mission in the future."

124.    In December 2009, intelligence officials from the United Arab Emirates reported to the Treasury Department that Iran was supporting the Taliban financially, providing them weapons, helping the Taliban to smuggle narcotics, and facilitating the movement of Taliban members. It was specifically noted that the IRGC and the Iranian Navy were involved in the provision of these various forms of material support to the Taliban.

125.    In March 2010, a Taliban commander was quoted as saying of Iran, "our religions and our histories are different, but our target is the same – we both want to kill Americans."

126.    In May 2010, Gen. McChrystal stated publicly that Iran was providing material support to the Taliban. He explained "[t]he training that we have seen occurs inside Iran with

fighters moving inside Iran" and that there is "clear evidence of Iranian activity, in some cases of providing weapons and training to the Taliban that is inappropriate."

127.    On August 3, 2010, the United States Department of the Treasury designated General Hossein Musavi and Colonel Hasan Mortezavi for their roles in supporting the Taliban. General Musavi was the leader of the Ansar Corps, the branch of the IRGC-QF responsible for carrying out activities within Afghanistan. Colonel Mortezavi is a senior officer in the IRGC-QF. The Treasury Department found that both General Musavi and Colonel Mortezavi, acting in their official roles, had provided "financial and material support to the Taliban." In that same report, the Treasury Department concluded that "the IRGC-QF provides select members of the Taliban with weapons, funding, logistics and training."

128.    On February 5, 2011, British troops intercepted a weapons shipment of rockets to the Taliban. British foreign secretary William Hague stated about the shipment that "detailed technical analysis, together with the circumstances of the seizure, leave us in no doubt that the weaponry recovered came from Iran."

129.    On March 7, 2012, the Treasury Department designated IRGC-QF General Gholamreza Baghbani as a Specially Designated Narcotics Trafficker. General Baghbani, acting in his official role as a senior IRGC-QF officer, facilitated a drug smuggling ring that involved the shipment of opium from Afghanistan into Iran in exchange for weapons. The drug smugglers working on behalf of General Baghbani would deliver weapons directly to the Taliban.

130.    In April 2012, the Department of Defense provided Congress with its Annual Report on Military Power of Iran and stated that the "active sponsorship of terrorist and insurgent groups, such as Lebanese Hizballah, Iraqi Shia groups, and the Taliban, are tools Iran uses to increase its regional power." The Report further explained that even though Iranian

"support to the Taliban is inconsistent with their historic enmity, it complements Iran's strategy of backing many groups to maximize its influence while also undermining U.S. and [NATO] objectives by fomenting violence." By means of "the IRGC-QF, Iran provides material support to terrorist or militant groups such as . . . the Taliban."

131.    The United States Department of State concluded that, in 2012, "the IRGC-QF trained Taliban elements on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets." The State Department further stated that arms transfers to the Taliban from Iran, including plastic explosives, had been going on since 2006.

132.    By July 2012, Iran had allowed the Taliban to open an office in Zahedan, Iran.

133.    On February 6, 2014, the Treasury Department designated two more IRGC-QF officers, Alireza Hemmati and Akbar Seyed Alhosseini, for their role in "supporting terrorism in Afghanistan and funneling Iranian assistance to the Taliban." This support included the provision of "logistical assistance" to an associate responsible for planning and executing terrorist attacks.

134.    Early in 2014, Iran allowed the Taliban to open an office in Mashhad, Iran.

135.    On May 27, 2014, President Obama announced that American combat operations in Afghanistan would end by December 2014 and that troop levels would be significantly reduced by that time. In anticipation of this troop withdrawal, Iran greatly accelerated its support pouring into Afghanistan.

136.    In June 2015, approximately six months before the Camp Sullivan Attack, a Taliban commander stated that "Iran supplies us with whatever we need." This same commander explained how he had been detained in Iran as an illegal laborer but was offered double his prior salary by the IRGC if he "went to work for them in Afghanistan." At that time, the IRGC was

operating at least four Taliban training camps within Iran and was increasing its transportation of weapons and explosives into Afghanistan.

137.    The emergence of a wing of the Islamic State ("ISIS") in Afghanistan in 2015 deepened Iran's desire to support the Taliban as a partner in the Iranian regime's ongoing battle against ISIS.

138.    On May 21, 2016, then Taliban leader Mullah Akhtar Mohammed Mansour was killed by a drone strike at the Iran-Pakistan border. The Taliban's chief spokesman, Zabihullah Mujahid, subsequently stated that Mullah Mansour had been visiting Iran to fulfill "ongoing battle obligations."

139.    Later in 2016, three IRGC-QF officers were killed in an American air strike against Taliban positions in the Farah province of Afghanistan.

140.    Beyond direct military training and supplies, Iran has long served as a financial lifeline for the Taliban through its involvement in and enabling of the Taliban's illegal drug trafficking. Narcotics are the Taliban's greatest source of income. Iran assists in this financing by allowing its border with Afghanistan to be crossed by the Taliban and enlisting members of the IRGC in the transport and sale of large quantities of illicit drugs.

141.    Iran's support for the Taliban and its Haqqani Network partners is ongoing and accelerating. In September 2017, Department of Defense officials reported that Iran had recently increased its support of anti-American forces in Afghanistan, specifically including the Taliban.

142.    On October 23, 2018, the Treasury Department announced the designation of eight individuals as a result of an international effort to curb Iran's illicit support for the Taliban. Among these individuals were:

- Mohammad Ebrahim Owhadi, as an IRGC-QF officer that reached an agreement in 2017 with a Taliban governor to ensure Iranian support for the Taliban in the Herat Province of Afghanistan. He was also involved in 2016 planning for a compound in Iran that would be used to house Taliban fighters and their families. In 2014, Owhadi was personally involved with distributing arms to Afghanistan on behalf of the IRGC-QF.

- Esma'il Razavi, who acted "for or on behalf of IRGC-QF and for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the Taliban." He was found to have personally encouraged and ordered the Taliban to carry out terrorist acts.

- Abdullah Samad Faroqui, the Taliban governor who conspired with Owhadi to further the training and support relationship between the Taliban and Iran. In early 2018, he personally received thousands of kilograms of explosives from the IRGC for distribution to Taliban commanders. He met with Iranian intelligence officials as early as 2006 to facilitate the supply of money and military equipment to the Taliban.

143.    In November 2018, the United States Government announced its recovery of an Iranian-made drone in Afghanistan that had been launched from Iran and used to surveil Afghan and American military installations. At the same time, the United States also revealed Iranian-made rockets that were recovered directly from Taliban forces.

144.    Taliban and Haqqani Network fighters continued to receive advanced military and tactical training from Iran in large numbers, with much of the training taking place inside of Iran. In exchange for this support, Iran demanded that the Taliban focus on particular targets, specifically including American personnel.

C.    **The Camp Sullivan Attack**

145.    Camp Sullivan was located close to the Kabul International Airport. In January 2016 it was regularly used for housing embassy personnel and private civilian contractors. Adjacent to Camp Sullivan was a residential complex known as Darya Village that was used for the same purpose.

146.    On January 4, 2016, Ellison, Ghafoory, Shirzad, Rahimi, Bigzad, Safi, Pardis, Gheyasi, John Doe 1, John Doe 2, John Doe 3, and John Doe 4 were on duty at or nearby Camp Sullivan and Darya Village operating with the scope of their various roles as contractors for agencies of the United States Government.

147.    That same evening, a truck containing more than three thousand pounds of explosive material was parked on the small road running between Camp Sullivan and Darya Village. At 6:34pm local time, the explosive material was detonated, causing a massive explosion.

148.    The concrete barriers separating Darya Village and Camp Sullivan from the road were completely destroyed in the blast.

149.    The crater left in the roadway was estimated to be as much as sixty feet wide and more than twenty feet deep.

150.    Ellison was in Kabul working on a U.S. Department of State protective services contract. He finished his work shift shortly after 6pm and went straight to work out at the Camp Sullivan gym facility. About fifteen minutes after he arrived, the blast detonated, ripping the roof off the room and tearing a hole in the gym's exterior wall. Ellison was knocked over by the force of the blast, struck in the head by a metal window frame, and sustained a variety of other injuries.

151.    Ghafoory was waiting in line to deliver food to U.S. personnel outside the embassy complex when he felt the explosion. He was thrown by the force of the blast against a wall, lost consciousness, and suffered a variety of injuries.

152.    Shirzad was cleaning gym equipment when the bomb detonated. He was in the closest building to the blast site, only about fifteen meters away. He lost consciousness for some time after the attack and suffered a variety of injuries.

153.    Rahimi was working at a computer desk inside an office when the blast occurred. His desk and parts of the building's structure fell onto his head and back. He lost consciousness for ten hours and suffered a variety of injuries.

154.    Bigzad was part of the cleaning crew. He was working inside one of the restrooms at the time of the explosion. The roof and walls of the room collapsed on him, causing a variety of injuries.

155.    Safi was cleaning restrooms when the blast happened. He lost hearing in both ears and suffered a variety of other injuries from the attack.

156.    Pardis was collecting trash when the bomb was detonated. He was knocked hard to the ground by the blast, losing consciousness and suffering a variety of injuries as a result.

157.    John Doe 1was working in the laundry room when the explosion occurred. He was knocked to the ground and the commercial machines he was working near fell on his head, back, and legs. He lost consciousness for seven hours and suffered a variety of injuries.

158.    Gheyasi was working as an emergency maintenance technician, standing outdoors, about twenty meters away from the barrier closest to the blast site, when the bomb was detonated. He was struck in the head, legs, and arms by flying debris, suffering a variety of injuries.

159.    John Doe 2 was on duty collecting garbage when the explosion happened. He was working about thirty meters from the blast site. He was knocked to the ground and hit his head, losing consciousness for six hours and suffering a variety of injuries.

160.    John Doe 3 was standing guard at Camp Sullivan's main gate at the time of the blast. He was trapped beneath a collapsed wall by the force of the explosion and suffered a variety of injuries.

161.    John Doe 4 completed his shift at the main gate at about 6:30pm, a few minutes before the explosion. He was waiting to hand off his equipment to the colleague taking the next shift when the bomb detonated. He was buried beneath stone and debris from the complex's exterior walls, lost consciousness, and suffered a variety of injuries.

162.    Official Taliban spokesman Zabihullah Mujahid claimed responsibility for the Camp Sullivan Attack on Twitter on behalf of the Taliban that same day.

163.    On September 25, 2023, an opinion issued from this District finding that "Iran's material support for the Taliban was a proximate cause of the [Camp Sullivan Attack]." *See Hammons v. Iran*, Case No. 1:19cv2518, ECF No. 32 at 6.

**D.    The Zanbaq Square Attack**

164.    Zanbaq Square is the name of an intersection in the diplomatic zone of Kabul, Afghanistan. It is located just outside of the heavily fortified "Green Zone" and in close proximity to many foreign embassies.

165.    At 8:25 a.m. local time on May 31, 2017, Zanbaq Square was filled with its normally high volume of morning rush hour traffic.

166.    At that same time and place, a large truck containing over three thousand pounds of explosives entered Zanbaq Square. The explosives were hidden in a large tanker truck normally used to clean out septic systems.

167.    Upon information and belief, the Taliban and/or the Haqqani Network planned and authorized this attack with the intent of detonating the explosives near buildings used by American diplomatic personnel and other diplomatic facilities for other foreign nations. The path of the truck in the moments prior to its detonation confirms this intent.

168.    However, before the truck reached its intended target, it passed through a checkpoint where it attracted the attention of various American-employed Afghan security guards, including John Doe 5, who approached the vehicle. Before John Doe 5 and his colleagues could get close enough to perform an inspection or detain those inside, the truck's occupants detonated the explosives.

169.    The blast resulted in damage at the embassies of China, Turkey, France, India, and Japan. Other embassy facilities close by included the United States, Britain, and Pakistan. Had the truck passed through the checkpoint that John Doe 5 was guarding, it would have had close access to a variety of American diplomatic buildings.

170.    The resulting massive explosion left a thirty-foot-deep crater in the roadway, destroyed more than fifty cars, killed at least 150 people, and injured over 400. John Doe 5 was killed instantly in the blast.

171.    On December 22, 2023, an opinion issued from this District finding "that Iran's material support to the Taliban and Haqqani Network proximately caused [the Zanbaq Square Attack]." *See M.M. v. Iran*, Case No. 1:21cv2783, ECF No. 38 at 12.

## V.    CAUSES OF ACTION

### COUNT I – PROVISION OF MATERIAL SUPPORT FOR THE
### EXTRAJUDICIAL KILLING INJURING ELLISON (28 U.S.C. § 1605A(c))

172.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

173.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

174.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

175.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against those working with the Americans, such as Ellison, was an expected and welcomed result of those actions.

176.    Such conduct violates 28 U.S.C. § 1605A.

177.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

178.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to those associated with the United States.

179.    Multiple individuals were killed by the Camp Sullivan Attack, qualifying it as an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

27

180.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Ellison was injured in the Camp Sullivan Attack.

181.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT II – PROVISION OF MATERIAL SUPPORT FOR THE EXTRAJUDICIAL KILLING INJURING GHAFOORY (28 U.S.C. § 1605A(c))

182.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

183.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

184.     Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

185.     As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against those working with the Americans, such as Ghafoory, was an expected and welcomed result of those actions.

186.     Such conduct violates 28 U.S.C. § 1605A.

187.     A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

188.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to those associated with the United States.

189.    Multiple individuals were killed by the Camp Sullivan Attack, qualifying it as an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

190.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Ghafoory was injured in the Camp Sullivan Attack.

191.    As a direct and proximate result of Iran's actions, his family members have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Ghafoory's society and comfort.

192.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

**COUNT III – PROVISION OF MATERIAL SUPPORT FOR THE**
**EXTRAJUDICIAL KILLING INJURING SHIRZAD (28 U.S.C. § 1605A(c))**

193.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

194.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

195.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

196.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against those working with the Americans, such as Shirzad, was an expected and welcomed result of those actions.

197.    Such conduct violates 28 U.S.C. § 1605A.

198.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

199.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to those associated with the United States.

200.    Multiple individuals were killed by the Camp Sullivan Attack, qualifying it as an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

201.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Shirzad was injured in the Camp Sullivan Attack.

202.    As a direct and proximate result of Iran's actions, his family members have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Shirzad's society and comfort.

203.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT IV – PROVISION OF MATERIAL SUPPORT FOR THE
## EXTRAJUDICIAL KILLING INJURING RAHIMI (28 U.S.C. § 1605A(c))

204.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

205.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

206.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

207.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against those working with the Americans, such as Rahimi, was an expected and welcomed result of those actions.

208.    Such conduct violates 28 U.S.C. § 1605A.

209.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

210.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to those associated with the United States.

211.    Multiple individuals were killed by the Camp Sullivan Attack, qualifying it as an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

212.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Rahimi was injured in the Camp Sullivan Attack.

213.    As a direct and proximate result of Iran's actions, his family members have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Rahimi's society and comfort.

214.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT V – PROVISION OF MATERIAL SUPPORT FOR THE EXTRAJUDICIAL KILLING INJURING BIGZAD (28 U.S.C. § 1605A(c))

215.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

216.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

217.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

218.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against those working with the Americans, such as Bigzad, was an expected and welcomed result of those actions.

219.    Such conduct violates 28 U.S.C. § 1605A.

220.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

221.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to those associated with the United States.

222.    Multiple individuals were killed by the Camp Sullivan Attack, qualifying it as an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

223.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Bigzad was injured in the Camp Sullivan Attack.

224.    As a direct and proximate result of Iran's actions, his family members have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Bigzad's society and comfort.

225.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT VI – PROVISION OF MATERIAL SUPPORT FOR THE EXTRAJUDICIAL KILLING INJURING SAFI (28 U.S.C. § 1605A(c))

226.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

227.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

228.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban,

including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

229.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against those working with the Americans, such as Safi, was an expected and welcomed result of those actions.

230.    Such conduct violates 28 U.S.C. § 1605A.

231.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

232.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to those associated with the United States.

233.    Multiple individuals were killed by the Camp Sullivan Attack, qualifying it as an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

234.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Safi was injured in the Camp Sullivan Attack.

235.    As a direct and proximate result of Iran's actions, his family members have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Safi's society and comfort.

236.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT VII – PROVISION OF MATERIAL SUPPORT FOR THE
## EXTRAJUDICIAL KILLING INJURING PARDIS (28 U.S.C. § 1605A(c))

237.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

238.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

239.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

240.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against those working with the Americans, such as Pardis, was an expected and welcomed result of those actions.

241.    Such conduct violates 28 U.S.C. § 1605A.

242.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

243.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to those associated with the United States.

244.    Multiple individuals were killed by the Camp Sullivan Attack, qualifying it as an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

245.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Pardis was injured in the Camp Sullivan Attack.

246.    As a direct and proximate result of Iran's actions, his family members have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Pardis' society and comfort.

247.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

**COUNT VIII – PROVISION OF MATERIAL SUPPORT FOR THE EXTRAJUDICIAL KILLING INJURING GHEYASI (28 U.S.C. § 1605A(c))**

248.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

249.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

250.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

251.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against those working with the Americans, such as Gheyasi, was an expected and welcomed result of those actions.

252.    Such conduct violates 28 U.S.C. § 1605A.

253.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

254.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to those associated with the United States.

255.    Multiple individuals were killed by the Camp Sullivan Attack, qualifying it as an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

256.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Gheyasi was injured in the Camp Sullivan Attack.

257.    As a direct and proximate result of Iran's actions, his family members have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Gheyasi's society and comfort.

258.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

### COUNT IX – PROVISION OF MATERIAL SUPPORT FOR THE EXTRAJUDICIAL KILLING INJURING JOHN DOE 1 (28 U.S.C. § 1605A(c))

259.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

260.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

261.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban,

including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

262.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against those working with the Americans, such as John Doe 1, was an expected and welcomed result of those actions.

263.    Such conduct violates 28 U.S.C. § 1605A.

264.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

265.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to those associated with the United States.

266.    Multiple individuals were killed by the Camp Sullivan Attack, qualifying it as an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

267.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, John Doe 1was injured in the Camp Sullivan Attack.

268.    As a direct and proximate result of Iran's actions, his family members have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of John Doe 1's society and comfort.

269.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT X – PROVISION OF MATERIAL SUPPORT FOR THE
## EXTRAJUDICIAL KILLING INJURING JOHN DOE 2 (28 U.S.C. § 1605A(c))

270.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

271.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

272.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

273.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against those working with the Americans, such as John Doe 2, was an expected and welcomed result of those actions.

274.    Such conduct violates 28 U.S.C. § 1605A.

275.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

276.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to those associated with the United States.

277.    Multiple individuals were killed by the Camp Sullivan Attack, qualifying it as an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

278.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, John Doe 2 was injured in the Camp Sullivan Attack.

279.    As a direct and proximate result of Iran's actions, his family members have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of John Doe 2's society and comfort.

280.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT XI – PROVISION OF MATERIAL SUPPORT FOR THE EXTRAJUDICIAL KILLING INJURING JOHN DOE 3 (28 U.S.C. § 1605A(c))

281.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

282.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

283.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

284.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against those working with the Americans, such as John Doe 3, was an expected and welcomed result of those actions.

285.    Such conduct violates 28 U.S.C. § 1605A.

286.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

287.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to those associated with the United States.

288.    Multiple individuals were killed by the Camp Sullivan Attack, qualifying it as an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

289.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, John Doe 3 was injured in the Camp Sullivan Attack.

290.    As a direct and proximate result of Iran's actions, his family members have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of John Doe 3's society and comfort.

291.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT XII – PROVISION OF MATERIAL SUPPORT FOR THE EXTRAJUDICIAL KILLING INJURING JOHN DOE 4 (28 U.S.C. § 1605A(c))

292.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

293.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

294.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban,

including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

295.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against those working with the Americans, such as John Doe 4, was an expected and welcomed result of those actions.

296.    Such conduct violates 28 U.S.C. § 1605A.

297.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

298.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to those associated with the United States.

299.    Multiple individuals were killed by the Camp Sullivan Attack, qualifying it as an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

300.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, John Doe 4 was injured in the Camp Sullivan Attack.

301.    As a direct and proximate result of Iran's actions, his family members have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of John Doe 4's society and comfort.

302.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT XIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

303.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

304.    The Taliban's acts of terrorism against the Attack Victims were intentional and reckless, extreme and outrageous, and caused Plaintiffs to experience severe emotional distress.

305.    The detonation of explosive devices by the Taliban violated acceptable norms of humane treatment under the laws of the United States and the acceptable norms of international law by which all civilized nations transact their affairs.

306.    These acts of terrorism were extreme and outrageous, perpetrated with the intent to intimidate and coerce.

307.    Iran, through its influence with the Taliban, knowingly and willfully provided material support, training, and direction to these acts of terrorism, with the express purpose of causing severe injury or death to the victims and intimidating others.

308.    Shabana Ghafoory, O.G., S.G., R.G., Bashar Mal Ghafoori, Shamsulhaq Ghafoori, Bas Bibi Shir Zad, Fardin Shir Zad, K.S., Su.S., Z.S., Khairallah Shirzad, Karishma Rahimi, Fazal Rahimi, Lailuma Rahimi, Frozan Bigzad, Forugh Bigzad, Farukh Bigzad, Bibi Bigzad, Sa.B., So.B., Shogofa Safi, M.S., Ar.S., Sh.S., Eqlima Pardis, Hasibullah Pardis, Rohullah Pardis, Lotfullah Pardis, B.P., M.P., Fazila Gheyasi, Mohammad Ghyasi, Bibi Gheyasi, Z.M., A.M., Y.M., Sh.O., Sad.O., M.A.O., M.Z.O., Mu.O., Sa.O., So.O., Sos.O., Mo.A.O., Ma.S., F.O., M.O., M.Q.O., M.W.O., M.M.O., Mas.S., Mo.S., S.S., Ab.S., and H.S. (collectively the "Family Member Plaintiffs") are the immediate family members of the Attack Victims.

309.     Iran knew, or reasonably should have known, that these terrorist acts and others like them would cause severe emotional distress to the immediate families of those targeted. The Family Member Plaintiffs were foreseeable victims.

310.     Therefore, Iran is responsible for the damages suffered by the Family Member Plaintiffs as a direct and proximate result of the Camp Sullivan Attack and the Zanbaq Square Attack.

311.     Because Iran acted in a willful and wanton manner, showing a conscious disregard for the rights of others, the Family Member Plaintiffs request an additional award of punitive damages.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award damages to Plaintiffs against Iran on all Counts as follows:

To Ellison, on Count I:

    a.   Compensatory damages for personal injuries to Ellison, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b.   Punitive damages in the amount of 3.44 times the compensatory judgments awarded to each individual;

    c.   Interest, from January 4, 2016 until the date of judgment; and

    d.   Such other and further relief as the Court may determine to be just and equitable under the circumstances.

To Ghafoory and his family, on Counts II and XIII:

    a.   Compensatory damages for personal injuries to Ghafoory, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b.   Solatium damages in a total amount of $28,000,000, comprised of the following sums:

-   $8,000,000 on behalf of Shabana Ghafoory, wife of Ghafoory;

-   $5,000,000 on behalf of O.G., minor child of Ghafoory;

-   $5,000,000 on behalf of S.G., minor child of Ghafoory;

-   $5,000,000 on behalf of R.G., minor child of Ghafoory;

-   $2,500,000 on behalf of Bashar Mal Ghafoori, brother of Ghafoory;

-   $2,500,000 on behalf of Shamsulhaq Ghafoori, brother of Ghafoory;

c.  Punitive damages in the amount of 3.44 times the compensatory judgments awarded to each individual;

d.  Interest, from January 4, 2016 until the date of judgment; and

e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

To Shirzad and his family, on Counts III and XIII:

a.  Compensatory damages for personal injuries to Shirzad, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

b.  Solatium damages in a total amount of $33,000,000, comprised of the following sums:

-   $8,000,000 on behalf of Bas Bibi Shir Zad, wife of Shirzad;

-   $5,000,000 on behalf of Fardin Shir Zad, son of Shirzad;

-   $5,000,000 on behalf of K.S., minor child of Shirzad;

-   $5,000,000 on behalf of Su.S., minor child of Shirzad;

-   $5,000,000 on behalf of Z.S., minor child of Shirzad;

-   $5,000,000 on behalf of Khairallah Shirzad, father of Shirzad;

c.  Punitive damages in the amount of 3.44 times the compensatory judgments awarded to each individual;

45

d.  Interest, from January 4, 2016 until the date of judgment; and

e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

To Rahimi and his family, on Counts IV and XIII:

a.  Compensatory damages for personal injuries to Rahimi, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

b.  Solatium damages in a total amount of $18,000,000, comprised of the following sums:

-  $8,000,000 on behalf of Karishma Rahimi, wife of Rahimi;

-  $5,000,000 on behalf of Fazal Rahimi, father of Rahimi;

-  $5,000,000 on behalf of Lailuma Rahimi, mother of Rahimi;

c.  Punitive damages in the amount of 3.44 times the compensatory judgments awarded to each individual;

d.  Interest, from January 4, 2016 until the date of judgment; and

e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

To Bigzad and his family, on Counts V and XIII:

a.  Compensatory damages for personal injuries to Bigzad, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

b.  Solatium damages in a total amount of $33,000,000, comprised of the following sums:

-  $8,000,000 on behalf of Frozan Bigzad, wife of Bigzad;

-  $5,000,000 on behalf of Forugh Bigzad, daughter of Bigzad;

-  $5,000,000 on behalf of Farukh Bigzad, son of Bigzad;

-  $5,000,000 on behalf of Bibi Bigzad, daughter of Bigzad;

      -   $5,000,000 on behalf of Sa.B., minor child of Bigzad;

      -   $5,000,000 on behalf of So.B., minor child of Bigzad;

c.  Punitive damages in the amount of 3.44 times the compensatory judgments awarded to each individual;

d.  Interest, from January 4, 2016 until the date of judgment; and

e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

To Safi and his family, on Counts VI and XIII:

a.  Compensatory damages for personal injuries to Safi, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

b.  Solatium damages in a total amount of $23,000,000, comprised of the following sums:

      -   $8,000,000 on behalf of Shogofa Safi, wife of Safi;

      -   $5,000,000 on behalf of M.S., minor child of Safi;

      -   $5,000,000 on behalf of A.S., minor child of Safi;

      -   $5,000,000 on behalf of Sh.S., minor child of Safi;

c.  Punitive damages in the amount of 3.44 times the compensatory judgments awarded to each individual;

d.  Interest, from January 4, 2016 until the date of judgment; and

e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

To Pardis and his family, on Counts VII and XIII:

a.  Compensatory damages for personal injuries to Pardis, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

b.  Solatium damages in a total amount of $33,000,000, comprised of the following sums:

- $8,000,000 on behalf of Eqlima Pardis, wife of Pardis;

- $5,000,000 on behalf of Hasibullah Pardis, son of Pardis;

- $5,000,000 on behalf of Rohullah Pardis, son of Pardis;

- $5,000,000 on behalf of Lotfullah Pardis, son of Pardis;

- $5,000,000 on behalf of B.P., minor child of Pardis;

- $5,000,000 on behalf of M.P., minor child of Pardis;

c. Punitive damages in the amount of 3.44 times the compensatory judgments awarded to each individual;

d. Interest, from January 4, 2016 until the date of judgment; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

To Gheyasi and his family, on Counts VIII and XIII:

a. Compensatory damages for personal injuries to Gheyasi, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

b. Solatium damages in a total amount of $18,000,000, comprised of the following sums:

- $8,000,000 on behalf of Fazila Gheyasi, wife of Gheyasi;

- $5,000,000 on behalf of Mohammad Ghyasi, father of Gheyasi;

- $5,000,000 on behalf of Bibi Gheyasi, mother of Gheyasi;

c. Punitive damages in the amount of 3.44 times the compensatory judgments awarded to each individual;

d. Interest, from January 4, 2016 until the date of judgment; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

To John Doe 1, John Doe 2, John Doe 3, John Doe 4 and their families, on Counts IX through XIII:

a.  Compensatory damages for personal injuries to John Doe 1, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

b.  Compensatory damages for personal injuries to John Doe 2, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

c.  Compensatory damages for personal injuries to John Doe 3, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

d.  Compensatory damages for personal injuries to John Doe 4, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

e.  Solatium damages in a total amount of $89,500,000, comprised of the following sums:

    -  $8,000,000 on behalf of Z.M., wife of John Doe 1;

    -  $5,000,000 on behalf of A.M., minor child of John Doe 1;

    -  $5,000,000 on behalf of Y.M., minor child of John Doe 1;

    -  $8,000,000 on behalf of Sh.O., wife of John Doe 2;

    -  $5,000,000 on behalf of Sad.O., daughter of John Doe 2;

    -  $5,000,000 on behalf of M.A.O., minor child of John Doe 2;

    -  $5,000,000 on behalf of M.Z.O., minor child of John Doe 2;

    -  $8,000,000 on behalf of Mu.O., wife of John Doe 3;

    -  $5,000,000 on behalf of Sa.O., minor child of John Doe 3;

    -  $5,000,000 on behalf of So.O., minor child of John Doe 3;

    -  $8,000,000 on behalf of Sos.O., wife of John Doe 4;

    -  $5,000,000 on behalf of Mo.A.O., father of John Does 1–4;

    -  $5,000,000 on behalf of Ma.S., mother of John Does 1–4;

- $2,500,000 on behalf of F.O., sister of John Does 1–4;

- $2,500,000 on behalf of M.O., sister of John Does 1–4;

- $2,500,000 on behalf of M.Q.O., brother of John Does 1–4;

- $2,500,000 on behalf of M.W.O., brother of John Does 1–4;

- $2,500,000 on behalf of M.M.O., brother of John Does 1–4;

f. Punitive damages in the amount of 3.44 times the compensatory judgments awarded to each individual;

g. Interest, from January 4, 2016 until the date of judgment; and

h. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

To the family of John Doe 5, on Count XIII:

a. Solatium damages in a total amount of $44,000,000, comprised of the following sums:

- $12,000,000 on behalf of Mas.S., widow of John Doe 5;

- $8,000,000 on behalf of Mo.S., son of John Doe 5;

- $8,000,000 on behalf of S.S., daughter of John Doe 5;

- $8,000,000 on behalf of Ab.S., minor child of John Doe 5;

- $8,000,000 on behalf of H.S., minor child of John Doe 5;

b. Punitive damages in the amount of 3.44 times the compensatory judgments awarded to each individual;

c. Interest, from May 31, 2017 until the date of judgment; and

d. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

Dated: July 15, 2025                    Respectfully submitted,

                                        _____/s/ Kevin A. Hoffman_____
                                        Randy D. Singer (DCD Bar No. VA057)
                                        Kevin A. Hoffman (DC Bar No. 1044559)
                                        Maryam M. Atty (DCD Bar No. VA137)
                                        SINGER HOFFMAN, LLC
                                        1209A Laskin Road
                                        Virginia Beach, VA 23451
                                        Phone: (757) 301-9995
                                        Fax: (757) 233-1084
                                        Email: randy.singer@singerhoffman.com
                                        Email: kevin.hoffman@singerhoffman.com
                                        Email: maryam.atty@singerhoffman.com
                                        *Counsel for Plaintiffs*